**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) No. 07 CR 590-1 |
| | ) |
| CHARLES TODD STOKES | ) Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

Defendant Charles Todd Stokes, a United States citizen, is charged with traveling in interstate and foreign commerce for the purpose of engaging in a sexual act with a minor, in violation of 18 U.S.C. §2423(b). Stokes moves to suppress evidence recovered during a September 2003 search of his home in Thailand. The search was conducted by officers of the Royal Thai Police, with assistance from American Immigration and Customs Enforcement (ICE) agents, pursuant to a Thai search warrant. Stokes challenges the search as a violation of the Fourth Amendment and seeks to exclude several items, including depictions of child pornography, recovered in the search. For the reasons explained here, the motion is denied.

**BACKGROUND**

The following facts are drawn from the accounts of Investigator Paisarn Changjongpradit and Special Agent Gary Phillips, American ICE officials who were present during the search of Stokes's home and testified at a hearing on October 21, 2009.

**I.      The Investigation**

Defendant Stokes is an American citizen who lived in Thailand during the relevant events. American ICE agents in Thailand began investigating Stokes in 2002 when they received a tip that Stokes had been fired from his job teaching English at a Thai school for having allegedly engaged in inappropriate contact with young students. (Hearing Tr. at 66-67.) ICE agents interviewed the administrators of the school and consulted the Federal Bureau of Investigation's criminal record database. They confirmed that Stokes had a criminal history involving crimes against children in

the United States.[1]  (*Id.* at 67.)  ICE agents also interviewed teachers and administrators at a second Thai school where Stokes had worked and from which he had been subsequently fired. (*Id.* at 67-68.)  A teacher who worked with Stokes told agents that Stokes had mentioned having "a boy or two" living with him at his former residence in Bangkok and that Stokes once made a comment about liking "them very young." (*Id.* at 68:2-12.)

Based on that information, Special Agent Phillips contacted the Royal Thai Police in January 2003.  A Royal Thai Police officer named Lieutenant Norwat informed Phillips that Thai police had been independently investigating Stokes since 2001.  (*Id.* at 68:14-22.)  Norwat also told Phillips that in an interview, the assistant manager of a building where Stokes lived in 2001 told Norwat he had seen two young boys visiting Stokes's quarters.  (*Id.* at 68-69.)

ICE agents then checked Stokes's work records and located a third Thai school where Stokes was employed in 2003.  (*Id.* at 69-70.)  Teachers at that school were interviewed and reported that Stokes had engaged in inappropriate physical contact with students and that Stokes had recently been living with a young boy in the Thai city of Pattaya, located roughly 200 kilometers south of Bangkok.  (*Id.* at 70-71; 8-9.)  In March 2003, ICE agents interviewed Christopher Phillips, a teacher and former colleague of Stokes, who stated that he believed Stokes to be a pedophile because Stokes regularly hugged and kissed a young male student and because Stokes had lived for a period with a "street kid," a boy Christopher Phillips estimated to be roughly 15 years old.  (*Id.* at 71:14-22.)

ICE agents initiated surveillance of Stokes' home in Pattaya in September 2003.  (*Id.* at 71-

---

[1]  Evidence of the nature of Stokes's criminal history is not in the record and is not relevant to the court's consideration of this motion.  For purposes of context only, the government asserts its brief that, in February 2000, Stokes pleaded guilty in a Miami-Dade County court to a misdemeanor battery charge arising from an incident in which Stokes attempted to touch two young boys' genital areas.  The government's brief also asserts Stokes was the subject of other allegations from the Miami School District, though he was never convicted of a crime in connection with any other incident.

72). After identifying a vehicle registered to Stokes and confirming that Stokes lived at the residence, ICE Investigator Paisarn contacted the Royal Thai Police in Pattaya. (*Id.* at 72:7-12.) Because of the significant distance between Stokes's residence and ICE's usual operating area in Bangkok, Investigator Paisarn asked the Thai police in Pattaya for assistance in conducting surveillance of Stokes and his residence. (*Id.* at 9-10.) At the time, the Thai police force in Pattaya did not have a unit that focused exclusively on child exploitation investigations. (*Id.* at 15:5-11.) Instead, Paisarn requested assistance from Colonel Thongsuk, a senior officer with the narcotics unit of the Royal Thai Police in Pattaya. (*Id.* at 10-11.) Paisarn believed that the Thai narcotics unit was best suited to assist the investigation because, unlike any other unit then operating in Pattaya, narcotics officers wore plain clothes and regularly conducted surveillance and undercover investigations. (*Id.* at 10-15.) On September 10, 2003, Investigator Paisarn briefed Colonel Thongsuk and informed him that Stokes was suspected of sexually exploiting children. (*Id.* at 15-16.) According to Paisarn, neither man mentioned any suspected connection between Stokes and drugs or drug use at this meeting. (*Id.*)

## II. The Search

In early October 2003, following weeks of surveillance,[2] Thai authorities informed Investigator Paisarn and Special Agent Phillips that the Thai provincial court of Pattaya had issued a warrant allowing Colonel Thongsuk and his men to search Stokes's home. (*Id.* at 18-19; 72-73) Colonel Thongsuk requested that Investigator Paisarn and Special Agent Phillips accompany the Thai police officers to observe the search and assist with English translation if needed. (*Id.* at 19:16-21.) Neither Paisarn nor Phillips viewed the Thai warrant before the morning of the search.

On the morning of October 9, 2003, Thai police officers, commanded by Colonel Thongsuk, executed the warrant with assistance from Investigator Paisarn, Special Agent Phillips, and other

---

[2] The court is not aware what, if anything, was learned in the course of surveillance of Stokes.

ICE investigators. The ICE agents and Thai police officers met outside Stokes's home at 6:10 a.m. Stokes was not at home at the time, however, so the officers waited for his return before attempting to enter. (Id. at 21-22.) While they were waiting, Paisarn reminded Thongsuk that the purpose of the search was to locate evidence of child exploitation. (*Id.*) Thongsuk agreed. (*Id.* at 21:7-12.) There is no indication that Thongsuk or Paisarn viewed the warrant at this time.

At 6:20 a.m., when Stokes arrived and attempted to enter the residence, Colonel Thongsuk stopped him and informed Stokes that Thai police had a warrant and intended to search the house. (*Id.* at 22-23.)[3] When it was clear that Stokes could not understand what Thongsuk was saying, Thongsuk called Paisarn over to translate. (*Id.* at 23:2-6.) Investigator Paisarn read the warrant, which was written in the Thai language, to Stokes in English. (*Id.* at 23:7-17.) This was the first time Paisarn read the warrant. (*Id.*) Special Agent Phillips testified that he could not read Thai and thus did not read the warrant. (*Id.* at 77:16-18). According to the certified English translation, the warrant empowered the Thai police to conduct a search of Stokes's residence "in order to locate and seize any illegal items and narcotics . . . of which possession is considered illegal or which was illegally obtained, or which has been used or is intended to be used to commit a crime." (Ex. 3 to Def.'s Mot. at 549.)

After being read the warrant, Stokes allowed the Thai police officers and ICE officials into the house. (Hearing Tr. at 23:18-22.) The Thai officers and Investigator Paisarn immediately moved to secure the house. (*Id.* at 74.) Special Agent Phillips entered only after the home was secured and after he was invited in by Thai officers. (*Id.*) Phillips testified that he did not engage in an independent search of the home. He explained, "I didn't know if I had really authorization to do that. I basically waited for the colonel to allow me to look around." (*Id.* at 75.)

Soon after entering the house, Thai officers heard noises coming from an upstairs room.

---

[3] Thai officers carried a video camera to document the search. The video recording and a transcript are in the record and confirm the account given by American ICE officials.

Stokes led Paisarn and Thai officers to the upstairs master bedroom where officers determined that the noise emanated from a television set. (*Id.* at 23-24.) Paisarn then searched the closet of the master bedroom, where he found a camera. (*Id.* at 24.) Stokes approached Paisarn and asked that Paisarn not remove the camera. (*Id.*) When Paisarn asked why, Stokes replied in Thai, "It is not polite." (*Id.*) Suspicious, Paisarn turned on the camera and discovered that the camera contained photographs of children committing sexual acts. (*Id.* at 24-25.) Paisarn called Colonel Thongsuk, who was leading the search, and showed Thongsuk the camera and photographs. (*Id.* at 25.) Thongsuk questioned Stokes as to the identity and location of the children in the photographs and told Paisarn to examine the full contents of the camera for "anything else that is illegal in the Thai law." (*Id.*) The camera contained several additional photographs of children performing sexual acts. Following the discovery of the camera, Stokes asked to speak with Special Agent Phillips. In response to Stokes's questions about why Phillips he was observing the search, Phillips explained that he was a U.S. law enforcement officer from the American embassy. (Id. at 75.)

Colonel Thongsuk also discovered a safe in master bedroom. Thongsuk suspected the safe contained illegal materials and asked Stokes to open it. (*Id.* at 26.) Before doing so, Stokes asked for Phillips's opinion about whether Stokes should cooperate. (*Id.* at 76.) Phillips replied that Thai police had a valid search warrant and that, were Phillips in Stokes's position, he would be as compliant as possible because the Thai police were treating Stokes very nicely. (*Id.*) At the hearing, Phillips explained that he meant that contrary to ICE's common practice, the Thai police had not handcuffed or otherwise secured Stokes and were instead permitting Stokes to walk around freely throughout the search. (*Id.*) Stokes opened the safe, and Thai officers recovered a recordable compact disc inside. (*Id.* at 27.) In response to questioning from Investigator Paisarn, Stokes admitted that the disc contained pornographic images of children and that Stokes himself had made some of the images on the disc. (*Id.*) Thai police also seized Stokes' computer after

5

Special Agent Phillips unplugged and disconnected the computer in a way that prevented the destruction of forensic evidence contained on the hard drive. (*Id.* at 76-77.)

At the conclusion of the search, Thai police again reviewed the warrant with Stokes, and Stokes read and signed an inventory of the seized items. (*Id.* at 27-28; 77.) Copies of the Search Record and the Daily Case Journal, which were composed shortly after the search and which detail the inventory and circumstances of the search, are in the record. (Ex. 3 to Def.'s Mot. at 550-56.) The inventory of items seized includes (1) a digital camera and SIM card; (2) seven used mini video tape cassettes; (3) seven compact discs; (4) a computer memory drive and "related equipment"; (5) a photo album containing pictures of children; and (6) a notebook computer with a compact disc in the drive. (*Id.* at 551.) The entire search lasted roughly two hours. (Hearing Tr. at 27-28.) Colonel Thongsuk and the Thai police removed all of the seized items from the home. (*Id.* at 28.) Later that day, Thongsuk turned the seized items over to Phillips and ICE investigators at the police station. (Id. at 87-89.)

The Daily Case Journal, prepared by the Royal Thai Police shortly after the search, describes the circumstances of the search as follows:

> Pattaya City Narcotics Suppression Police were alerted by an Investigating Officer of U.S. Customs Enforcement in Thailand that there was ongoing drug use at the aforesaid location. A search warrant was then obtained from Pattaya Provincial Court in order to conduct a search to locate and seize the aforesaid items and property for further investigation.

(Ex. 3 to Def.'s Mot. at 554.) On cross-examination, both Investigator Paisarn and Special Agent Phillips denied that U.S. Customs agents ever told Thai officials that there was ongoing drug use at Stokes's residence. (Hearing Tr. at 39; 80.)

### III. Procedural History

Stokes was arrested in 2006, returned to the United States, and charged with traveling in interstate and foreign commerce for the purpose of engaging in a sexual act with a minor, in violation of 18 U.S.C. § 2423(b). In this motion to suppress, Stokes contends that the Thai warrant

6

was invalid, that the American agents involved in the search exceeded the scope of the warrant, and that the search was constitutionally unreasonable. The court denies Defendant's motion to suppress for the reasons stated below.

## DISCUSSION

As far as the court is aware, neither the Supreme Court nor the Seventh Circuit Court of Appeals has had occasion to fully delineate the scope of the Fourth Amendment's application to American citizens searched by American officials abroad.[4] The court is nevertheless guided by well-recognized principles. The Fourth Amendment to the United States' Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"[T]he purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own government." *United States v. Verdugo-Urquidez,* 494 U.S. 259, 266 (1990). For that reason, "[i]t is a basic principle of the Fourth Amendment that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions." *Id.* (Internal quotation marks omitted). These exceptions include, for example, circumstances when police are in "hot pursuit" of a suspect*, United States v. Santana*, 427 U.S. 38, 42 (1976), efforts to prevent the imminent destruction of evidence, *Ker v. California*, 374 U.S. 23, 40 (1963), and efforts to prevent the immediate destruction of private property or loss of life, *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). These exceptions demonstrate that the Fourth Amendment's command that

---

[4] As the Second Circuit Court of Appeals said in *In re Terrorist Bombings of U.S. Embassies in East Africa*, "The question of whether a warrant is required for overseas searches of U.S. Citizens has not been decided by the Supreme Court, by our Court, or, as far as we are able to determine, by any of our sister circuits." 552 F.3d 157, 168 (2nd Cir. 2008).

searches be reasonable is related to but not conterminous with the Fourth Amendment's warrant requirement.[5] There are times when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978).

Stokes's primary challenge to the search of his home is implicitly based on the warrant requirement. Stokes does not claim that he was subject to a warrantless search, but he contends that the Thai warrant obtained by police was facially invalid for lack of particularity and, in the alternative, that American and Thai law enforcement officers exceeded the warrant's scope. Stokes also attempts to couch his contentions in terms of the Fourth Amendment's prohibition of unreasonable searches. In response, the government argues that the warrant clause of the Fourth Amendment has no extraterritorial application, that law enforcement officers acted reasonably during the conduct of the search and seizures in this case, and that American law enforcement officials relied in good faith on the Thai warrant and the actions of Thai authorities.

Though Stokes conflates his reasonableness and Warrant Clause arguments, the court believes these arguments implicate distinct constitutional principles. As explained below, the court concludes that (I) the Fourth Amendment has general application to the search at issue in this case; but (ii) the Warrant Clause does not govern the search; (iii) the search of Stokes's home was not unreasonable; and (iv) even assuming that a Fourth Amendment violation did occur, the suppression of evidence is not appropriate in this case given the purposes of the exclusionary rule.

**I.     Applicability of the Fourth Amendment**

---

[5] As the Ninth Circuit Court of Appeals has observed, "it is clear that the amendment contains two independent clauses. The first clause prohibits 'unreasonable' searches and seizures. The second clause, the Warrant Clause, describes the procedures that must be followed in obtaining a warrant . . . . The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear of the reasonableness of a search, in certain limited circumstances neither is required.' " *United States v. Barona*, 56 F.3d 1087, 1093, FN 1 (9th Cir. 1995)(quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985)(internal quotations omitted)).

As a threshold matter, the court finds, and the Government appears to agree, that the Fourth Amendment is implicated in this instance. This case involves conduct by agents of the United States and Thailand to search the home and seize the property of an American citizen living abroad. Generally, Fourth Amendment principles do not apply to searches by foreign authorities in their own countries, even if the targets of the search are American citizens. *See United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987). An exception occurs, however, when the participation of United States agents in the investigation is so substantial that the action is a joint venture between the United States and foreign officials. *Id.*; *United States v. Barona,* 56 F.3d 1087, 1091 (9th Cir. 1995).

Though Thai authorities apparently directed the search of Stokes's home in this case, American law enforcement agents were substantially involved in both the search and the investigation that led to it. The surveillance preceding the search of Stokes's home was undertaken at the behest of American ICE officials. ICE investigators conferred with Thai authorities on the purposes and targets of the search. ICE agents entered Stokes's home and assisted in the search. ICE Investigator Paisarn was among the first officers to speak with Stokes. Paisarn was also among the first group to enter and secure the house, and he alone recovered and first examined the camera found in the closet of the master bedroom. ICE Special Agent Phillips encouraged Stokes to comply with the search and assisted in the removal of Stokes's computer. Though the items taken from Stokes's home were initially seized by Thai authorities, they were turned over to American ICE agents later on the day of the search. This level of involvement by American ICE agents supports the conclusion that the search was a joint operation by American and Thai authorities, and, thus, implicates the Constitution of the United States. *Cf. United States v. Marzano*, 537 F.2d 257, 269-71 (7th Cir. 1976) (FBI agents who merely provided information to and observed Grand Cayman Island police were not participants in a search in that country, where Grand Cayman officials stated that the FBI had no jurisdiction to investigate, select evidence to

9

seize, or question and search suspects.)

In *Verdugo*, the Supreme Court held that only "persons who are part of the national community or who have otherwise developed sufficient connection" with the United States are entitled to Fourth Amendment protection from U.S. actions abroad. *See Verdugo*, 494 U.S. at 265. Stokes is a citizen of the United States. As such, Stokes is a member of "the people," as the Fourth Amendment uses the term, and he is entitled to some measure of the amendment's protection.[6] *Id.*

## II.  The Warrant Requirement In Overseas Searches

Having concluded that the Fourth Amendment is implicated, the court must address those of Stokes's arguments that implicitly rely on the Warrant Clause, which describes the procedures by which the government may generally conduct a search or seizure. The clause requires that, before a valid search may take place, police must obtain a warrant from a neutral and disinterested magistrate based on a showing of probable cause. *United States v. Robinson*, 546 F.3d 884, 887 (7th Cir. 2008). The warrant must describe, with particularity, the place to be searched and the items or persons to be seized. *See Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009). Typically, a warrant that fails to conform to the particularity requirement is unconstitutional and facially invalid. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984).

The search of Stokes's home was conducted pursuant to a warrant issued by a Thai provincial court. That warrant permitted law enforcement officers to enter and search the home "in order to locate and seize any illegal items and narcotics . . . of which possession is considered

---

[6] As the court explains in Part II, however, while Stokes is entitled to some measure of the Fourth Amendment's protection, he is not entitled to the full measure of the amendment's protection. It is not an irrelevancy that Stokes's home is located in a foreign nation, as the Warrant Clause of the amendment does not apply with equal force in foreign lands.

illegal or which was illegally obtained, or which has been used or is intended to be used to commit a crime." (Ex. 3 to Def.'s Mot. at 549.) Stokes contends that the Thai warrant is entirely invalid because it fails to particularly describe the items to be seized. In the alternative, Stokes contends that the warrant relates only to the recovery of narcotics and that police exceeded the scope of the warrant by searching and seizing the camera and computer, items that Stokes claims could not have contained narcotics-related evidence. In support, Stokes invokes the Supreme Court's plurality opinion in *Reid v. Covert,* which states that "[w]hen the government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." 354 U.S. 1, 6 (1957).

More recently, however, the Supreme Court has explained that the ambit of the Fourth Amendment's extraterritorial application is more limited than the broad language of *Reid* might otherwise suggest. *See Verdugo*, 494 U.S. at 270. In *Verdugo*, the Supreme Court addressed whether the Fourth Amendment protected a Mexican suspect from a warrantless search of his homes in Mexico by American and Mexican police. After arresting and taking custody of defendant Verdugo*,* a suspected drug kingpin, U.S. Drug Enforcement agents forcibly broke into his homes in Mexicali and San Felipe to search for evidence without having obtained a warrant either in Mexico or the United States. The Court held that Verdugo was not entitled to any Fourth Amendment protection, because the amendment did not reach abroad to protect a foreign national who lacked "sufficient connections" with the United States. *Id.* at 265. In *Verdugo*, the Court read the holding of *Reid* as narrowly addressing the Due Process rights of American civilians living abroad on U.S. military bases. *Id.* at 270. Justice Kennedy, who joined the opinion of the Court in *Verdugo* and elaborated in a separate concurrence, stated, "[the Court] must interpret constitutional protections in light of the undoubted power of the United States to take actions to assert its legitimate power and authority abroad." (*Id.* at 277)(Kennedy, J., concurring). To that

11

end, Justice Kennedy quoted at length from Justice Harlan's concurrence in *Reid*, stating in part:

> "I cannot agree with the suggestion that every provision of the Constitution must always be deemed automatically applicable to American citizens in every part of the world . . . . The proposition is, of course, not that the constitution 'does not apply' overseas, but that there are provisions in the Constitution which do not *necessarily* apply in all circumstances in every foreign place. . . [T]here is no rigid and abstract rule that Congress, as a condition precedent to exercising power over Americans overseas, must exercise it subject to all the guarantees of the Constitution, no matter what the conditions and considerations are that would make adherence to a specific guarantee altogether impractical and anomalous."

354 U.S. at 74, *quoted by Verdugo,* 494 U.S. at 277-78. Justice Harlan's narrower view, as adopted by Justice Kennedy, has largely come to dominate the *Reid* plurality's reference to the broad foreign reach of the "shield of the Bill of Rights."[7]

It is a matter of first impression in this Circuit whether the Warrant Clause of the Fourth Amendment governs searches and seizures of U.S. citizens in foreign lands. The court is not aware of any case, and Stokes presents no authority, that holds that the Warrant Clause ever applies in foreign territory. Such an extension of the warrant requirement would be, in Justice Harlan's words, "impractical and anomalous." Accordingly, the court holds that the Warrant Clause does not apply to the search of Stokes's residence in Thailand. Stokes's objections to the search based on the invalidity of the Thai warrant and the scope of the search are overruled.

Though it has not addressed the issue directly, the Supreme Court has strongly suggested that the Warrant Clause has no extraterritorial application. Writing for the Court in *Verdugo*, Justice Rehnquist explained that warrants issued to conduct searches abroad "would be a dead letter outside the United States." 494 U.S. at 274. Justice Kennedy elaborated:

---

[7] *See, e.g., Barona,* 56 F.3d at 1093, quoting *Verdugo,* 494 U.S. at 270. "[The sweeping language of the *Reid* plurality] would have been in a dissent were it not for the concurrences of Justices Frankfurter and Harlan, who 'resolved the case on much narrower grounds than the plurality and declined even to hold that United States citizens were entitled to the full range of constitutional protections in all oversees criminal prosecutions.' . . . [In *Verdugo*] the Supreme Court unequivocally refused to conclude that *Reid* stands for [such a] 'sweeping proposition.'"

12

> The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country.

*Id.* at 278 (Kennedy, J., concurring). Justice Steven's brief concurrence and Justice Blackmun's dissent also similarly suggest that the Warrant Clause does not govern overseas searches, at least where the targets of those searches are not U.S. citizens. *Id.* at 279 (Stevens, J., concurring)("[The Warrant Clause has no] application to searches of noncitizens' homes in foreign jurisdictions because American magistrates have no power to authorize such searches."); *Id.* at 297(Blackmun, J., dissenting)("I agree with the Government, however, that an American magistrate's lack of power to authorize a search abroad renders the Warrant Clause inapplicable to the search of a noncitizen's residence outside this county.") All told, seven Justices in *Verdugo* seemed to agree that, because United States courts lack the sovereign authority to issue warrants abroad, the procedures and requirements set forth by the Warrant Clause do not apply to foreign searches.

According to the only federal appellate court to have considered the issue, the "warrant requirement does not govern searches conducted abroad by U.S. agents; such searches of U.S. citizens need only satisfy the Fourth Amendment's requirement of reasonableness." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 167 (2nd Cir. 2008). In the *Terrorist Bombings* case, U.S. officials wiretapped and searched the home of an American citizen living in Kenya pursuant to a Kenyan warrant that authorized a search for "stolen property." *Id.* at 159-60. The homeowner was suspected of assisting the bombings of American embassies in Kenya and Tanzania, not of possessing stolen property. *Id.* Relying on *Verdugo*, the Second Circuit determined that the Warrant Clause did not apply to any search of a U.S. citizen abroad by American officials. The court offered four reasons for its decision: "First, there is nothing in our history or our precedent suggesting U.S. officials must first obtain a warrant before an overseas search." *Id.* at 169. "Second, nothing in the history of the foreign relations of the United States

13

would require that U.S. officials obtain warrants from foreign magistrates before conducting searches overseas or, indeed, to suppose that all other states have search and investigation rules akin to our own." *Id.* at 170. "Third, if U.S. judicial officers were to issue search warrants intended to have extraterritorial effect, such warrants would have dubious legal significance, if any, in a foreign nation." *Id.* at 171. "Fourth and finally, it is by no means clear that U.S. judicial officers could be authorized to issue warrants for overseas searches." *Id.*

The court finds the Second Circuit's reasoning persuasive here. The Thai court in Pattaya, not some distant American magistrate, was the sole sovereign entity with the power to authorize a search of Stokes's home. As such, Thai procedures govern the investigation and search. The Warrant Clause has no application in Thailand, and, as a result, Stokes's challenges to the sufficiency of the Thai warrant and the scope of the search must fail. "Some who violate our laws may live outside our borders under a regime quite different from that which obtains in this country." *Verdugo*, 494 U.S. at 275. Though the Thai warrant issued in this case may not satisfy the warrant requirements imposed by the Fourth Amendment, the issuance and execution of the warrant is governed by regimes prevailing in Thailand and does not offend the Constitution of the United States.

### III. The Reasonableness Requirement In Overseas Searches

While the Warrant Clause does not apply to the search of Stokes's home in Thailand, Stokes is not deprived of the Fourth Amendment's protection from unreasonable searches. *See, e.g., United States v. Conroy*, 589 F.2d 1258, 1263 (5th Cir. 1979)("The Fourth Amendment not only protects all within our bounds; it also shelters our citizens wherever they may be in the world from unreasonable searches by our own government."); *In re Terrorist Bombings*, 552 F.3d at 167. To determine whether a search is reasonable under the Fourth Amendment, the court must examine the totality of the circumstances, balancing "on the one hand, the degree to which it intrudes upon the individual's privacy and, on the other, the degree to which it is needed for the

promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006)(quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)).

The court recognizes that, as a general matter, the search of a citizen's home is a significant intrusion upon individual privacy. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001)(quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Balanced against that interest, in this case, is the government's interest in ensuring compliance with its laws and in preventing the sexual exploitation of children. "The fundamental object that alone validates all unconsented government searches, is of course, the seizure of persons who have committed or are about to commit crimes, or of evidence related to crimes." *Illinois v. Rodriguez*, 497 U.S. 177, 184 (1990).

In the court's view, the government's conduct in this case was not unreasonable. The search of Stokes's home occurred only after lengthy investigations by both Thai and American authorities. Those investigations produced information that would have almost certainly been sufficient to establish probable cause for the search that took place. Probable cause demands no more than a proper "assessment of probabilities in particular factual contexts . . . ." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Stokes had been fired from two Thai schools in one year for touching children inappropriately. His colleagues at a third school told investigators that he continued to engage in similar behavior. Stokes had a history of sexually assaulting children, and a criminal conviction for inappropriately touching a child in the United States. He was seen regularly hugging and kissing one particular male student. Two credible informants separately indicated that Stokes, an unmarried, middle-aged man, intimated that he was sexually attracted to children and boasted about living with young Thai boys. ICE Investigators also verified through cooperation with Thai authorities that a witness had, on at least one occasion, seen young boys reporting to Stokes's private quarters. Taken as a whole, this information gave investigators sufficient cause to believe

that crimes had occurred or were occurring inside Stokes's residence and that evidence of those crimes was likely to be found there.

      The entry into Stokes's home was not unreasonable. ICE investigators and Thai authorities acted pursuant to a validly issued Thai warrant, albeit one that ostensibly sought evidence of narcotics use. The search occurred in daylight. It was not conducted covertly. Instead, officers waited until Stokes was present before entering the home. *Cf. In re Terrorist Bombings*, 552 F.3d at 173; *United States v. Bin Laden,* 126 F. Supp. 2d 264, 285 (2000)(finding that the intrusiveness of a search was "minimized" by being conducted openly, in daylight, with a household member present.) Officers did not enter unbidden into Stokes's home while he was asleep or while he engaged in some other private act. Stokes himself opened the house's gate and unlocked its door to permit the entry of Thai officers. The warrant was read to Stokes by American officials who were available to translate and explain the purpose of the search. Stokes was not manacled or restrained in any way during the search; he was completely free to observe the actions of the Thai and American officials and to communicate with them while the search took place. The video of the search taken by Thai police shows that Thai and U.S. officers were highly accommodating toward Stokes, asking his permission before handling items and allowing Stokes to retrieve items from a locked safe himself. Officers did not intimidate or act even slightly aggressively toward Stokes. As far as the video depicts, no officer even raised his voice. Stokes apparently felt so comfortable that he consulted Special Agent Phillips as to whether he should comply with the instructions and requests of Thai officers at all. The video also shows that the search was conducted in an orderly fashion so as to avoid unnecessary harm or disruption to Stokes's belongings. The home was not ransacked. Items were not strewn about. Containers were not broken open. The search lasted roughly two hours, not an excessive amount of time, and Stokes was provided with an inventory of the items seized, which he signed. Stokes was not immediately arrested or otherwise detained.

While any search of a home is an invasion of privacy, Thai and U.S. officials acted reasonably to minimize the intrusiveness of the search in this case. The conduct of the search was not unreasonable.

## IV. Thai Law and the Good-Faith Exception

As already stated, Stokes contends that the search and seizure of his camera and computer are unreasonable because U.S. agents lacked authority to search containers that could not contain drug-related evidence. Accordingly, Stokes seeks to suppress evidence retrieved from the camera and computer under the exclusionary rule announced in *Weeks v. United States,* 232 U.S. 383 (1914). While the court believes that its holding on the non-applicability of the Warrant Clause dooms Stokes's argument, there is also another reason for the court to deny his motion. In conducting the search of Stokes's camera and computer, U.S. officials relied in good faith on the representations of Thai legal authorities. As a result, even assuming that a violation of Stokes's Fourth Amendment rights occurred, the exclusion of evidence found on the camera and computer would not be appropriate.

Application of the exclusionary rule is not an automatic consequence of a violation of the Fourth Amendment. *Herring v. United States*, 129 S. Ct. 695, 698 (2009). "The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and . . . the use of fruits of a past unlawful search and seizure 'work[s] no new Fourth Amendment wrong.'" *United States v. Leon*, 468 U.S. 897, 906 (1984)(quoting *United States v. Calandra*, 414 U.S. 338, 354 (1974)). The wrong condemned by the Fourth Amendment is fully accomplished at the time of an unreasonable governmental intrusion, and the exclusionary rule is not intended to cure the invasion of the defendant's rights. *Leon*, 468 U.S. at 906. Instead, the exclusionary rule exists to deter wrongful police conduct. *Stone v. Powell*, 428 U.S. 465, 486 (1976). Where the marginal deterrence of wrongful police conduct cannot justify the substantial

costs to the court's truth-seeking function of suppressing otherwise relevant evidence, application of the exclusionary rule is inappropriate. *Leon*, 468 U.S. at 922.

It is well settled that the exclusionary rule does not apply when police act in objectively reasonable reliance on a subsequently invalidated search warrant. *Id.*; *Herring*, 129 S. Ct. at 701. The same "reasoning applies as well to reliance on foreign law enforcement officers' representations that there has been compliance with their own law." *Peterson*, 812 F.2d at 492. In *Peterson*, which involved a joint wiretap by American drug enforcement agents and Philippine officials, the Ninth Circuit said that "permitting reasonable reliance on representations about foreign law is a rational accommodation to the exigencies of foreign investigations." *Id.*; *see also United States v. Juda,* 46 F.3d 961, 968 (9th Cir. 1995)(applying the good-faith exception to the exclusionary rule where a U.S. Drug Enforcement agent installed a radio transmitter on a private ship without a warrant, in reliance on advice from Australian officials). U.S. law enforcement officers who reasonably rely on a foreign authority's representations of applicable foreign law have not engaged in any culpable police misconduct. Excluding evidence gathered under such circumstances would do nothing to serve the deterrent purpose of the exclusionary rule.

In this case, Thai officials told ICE investigators that they had a valid warrant to search Stokes's home. Though Defendant now attempts to make much of the fact that the warrant mentions narcotics rather than child exploitation, that inconsistency alone does not make the U.S. officials' reliance on the warrant unreasonable.[8] Investigator Paisarn did not have an opportunity to inspect the warrant until the search was in progress, and Special Agent Phillips cannot read the

---

[8] Stokes suggests that American ICE agents acted in bad faith to obtain a warrant by misleading the Thai court and the Royal Thai Police into thinking that narcotics were present in Stokes's home. As evidence, Stokes points to a reference in the Thai Daily Case Journal, composed by Thai police after the search was conducted, which suggests Customs officials alerted Thai police to narcotics use at Stokes's address. Both Paisarn and Phillips squarely deny misleading Thai authorities, and the court finds their testimony credible.

Thai language in which the warrant was written. Even if American officials had reviewed the warrant in advance, they had no reason to suspect that the warrant might be deficient under Thai law. The warrant—which by all appearances was properly issued by a Thai court—purports on its face to authorize a broad search for "any illegal items." In addition, prior to the search, Investigator Paisarn spoke with Colonel Thongsuk, the senior Thai official involved, and Thongsuk confirmed the search's purpose: to recover evidence of child exploitation. When Investigator Paisarn recovered the camera, Thongsuk ordered Paisarn to examine the camera's contents for "anything else that is illegal in the Thai law." (Hearing Tr. at 25.) Similarly, Special Agent Phillips disconnected Stokes's computer so that Thai police could seize the item without damaging forensic evidence. The video and testimonial evidence before the court shows that ICE agents were deferential to Colonel Thongsuk and the Thai authorities, waiting until Thongsuk directed them to act and then doing as he instructed.

When American officials assisted in searching Stokes's home, they acted pursuant to a Thai warrant and under instructions from Thai police. American authorities reasonably relied on legal representations made by Thongsuk and by the Thai court that issued the search warrant. As such, the court finds the American ICE agents engaged in no misconduct. Given that the concern for deterrence that motivates the exclusionary rule is not implicated here, the suppression of evidence would be inappropriate in this case.

**CONCLUSION**

Defendant Stokes's motion to suppress evidence [59] is denied.

ENTER:

Dated: December 11, 2009

_____
REBECCA R. PALLMEYER
United States District Judge