UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 07 CR 590 ) |
| CHARLES TODD STOKES, | ) Judge Rebecca R. Pallmeyer ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Defendant Charles Todd Stokes is charged with traveling to Thailand for the purpose of engaging in sexual contact with a minor, in violation of 18 U.S.C. § 2423(b). At trial, the government may seek to admit evidence that Stokes made potentially incriminating statements to Thai and U.S. law enforcement officers during the search of his residence in Thailand and subsequent questioning at a Thai Police station. Because there are disputes concerning whether Stokes was in custody at the time he gave the statements and whether they were voluntary, the court will conduct an evidentiary hearing to determine whether some or all of Stokes's statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). *Miranda* is potentially implicated in this context because Stokes was interrogated pursuant to a joint investigation by Thai and U.S. authorities. The court here offers some brief observations concerning the applicable law and the scope of the evidence the court expects to consider.

Stokes appears to have made admissions at three separate times: (1) during the search of his home, (2) during subsequent questioning by a Thai officer and a U.S. investigator at a nearby police station, and (3) during a separate interrogation by U.S. customs agents following the issuance of *Miranda* warnings. The primary issue that the court will consider in the context of an evidentiary hearing is whether Stokes was "in custody" for *Miranda* purposes during any of these three time periods. Stokes has also alleged that Thai officers and a U.S. investigator "repeatedly assured [Stokes] that his statements would not be used against him in any way." (Def.'s Mot, D.E.

146, ¶ 3). Those assurances, Stokes urges, support the conclusion that his statements were not voluntary. The court considers these arguments and other prospective issues below.

## DISCUSSION

I.   **Applicability of *Miranda***

Generally, voluntary statements elicited by foreign law enforcement officers in their own nations are admissible in criminal prosecutions in the United States despite any failure by foreign authorities to give *Miranda* warnings. *United States v. Abu Ali*, 528 F.3d 210, 227 (4th Cir. 2008); *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir.2003); *United States v. Heller,* 625 F.2d 594, 599 (5th Cir. 1980); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir.1973). This is because "the United States cannot dictate the protections provided to criminal suspects by foreign nations and one of the principal purposes of the exclusionary rule–deterrence of unlawful police activity–is absent when foreign agents direct an interrogation." *Abu Ali,* 528 F.3d at 227; *United States v. Martindale*, 790 F.2d 1129, 1132 (4th Cir.1986) ("[T]he exclusionary rule has little or no effect upon the conduct of foreign police.")

The standards applicable to the acts of foreign officials do not, however, permit U.S. law enforcement officers to evade *Miranda* by purposefully delegating interrogation duties to their foreign counterparts and presenting the fruits of the interrogation at a criminal trial in the United States. *Abu Ali,* 528 F.3d at 227. Thus, when U.S. officials have "actively participated" in an overseas investigation or interrogation, such that the action is a "joint venture" between U.S. and foreign law enforcement, *Miranda* and the exclusionary rule apply exactly as though the interrogation took place inside the United States. *Yousef*, 327 F.3d at 145; *Heller*, 625 F.2d at 599; *Abu Ali,* 528 F.3d at 228; *but see Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980) (mere U.S. presence at an interrogation does not constitute active involvement); *United States v. Trenary*, 473 F.2d 680, 682 (9th Cir. 1973) (no joint venture when American customs officer, who never identified himself, translated questions asked by Mexican officers).

In this case, the court has already found that U.S. agents were active participants in all facets of the investigation, and that the investigation and surveillance of Stokes took place largely at the behest and under the direction of the United States. *United States v. Stokes*, No. 07 CR 590, 2009 WL 4894600, *5-6 (N.D.Ill Dec. 11, 2009) (The "level of involvement by American ICE agents supports the conclusion that the search was a joint operation by American and Thai authorities, and, thus, implicates the Constitution of the United States."); *cf. United States v. Emery*, 591 F.2d 1266, 1268 (9th Cir.1978) (investigation was a joint venture where American officials "alerted the Mexican police of the possible activity, coordinated the surveillance," participated in the sting operation, "gave the signal that instigated the arrest," and were present at the interrogation); *Abu Ali,* 528 F.3d at 220 ("coordination and direction of an investigation" constitutes active participation in a joint venture). Accordingly, the *Miranda* protections are applicable, in spite of the substantial participation of foreign law enforcement officials and the fact that Stokes was questioned on foreign soil. As a matter of law, Stokes possessed the same right to receive *Miranda* warnings that he would have had as a suspect questioned inside the United States.

**II.     The *Miranda* Test**

Whether the facts support the conclusion that Stokes was, in fact, entitled to *Miranda* warnings is disputed. *Miranda* warnings are not required merely because the individual questioned by law enforcement officers is a suspect or is the focus of a criminal investigation. Instead, a defendant must be both "in custody" and subjected to an "interrogation" before warnings must be administered. *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006). In this case, there is no disagreement that officers solicited information from Stokes. The parties dispute, however, whether Stokes was in police custody during any of the three time periods during which he made admissions.

A defendant is in custody when he has been "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444 (footnote omitted); *California v. Beheler*, 463 U.S. 1121,

1123 (1983) (per curiam) (no *Miranda* warnings required for a voluntary participant in a police station interview). The test is whether a reasonable person in the defendant's position would believe that he or she was free to leave. *United States v. Budd*, 549 F.3d 1140, 1145 (7th Cir. 2008) (citing *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir.1990)). To decide this fact-dependent question, the court must "examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (quoting *Beheler*, 463 U.S. at 1125, and *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Some of the factors that courts typically consider in this context include: (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individual was moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed. *See Barker*, 467 F.3d at 628-29 (internal quotations and citations omitted). At the hearing, the court will consider the evidence in the light of these standards. In addition, each group of challenged statements presents unique issues, outlined below.

### III.     The Search of Stokes's Residence

On the morning of October 9, 2003, a joint team of U.S. customs agents and officers of the Royal Thai Police force executed a search warrant on Stokes's home in the city of Pattaya, Thailand. During the search, U.S. Customs Investigator Paisarn Changjongpradit recovered a digital camera in Stokes's bedroom closet. Stokes approached Paisarn and asked that he not remove the camera because, Stokes said, "It [was] not polite." Suspicious, Paisarn turned the camera on and discovered that it contained several nude and sexually suggestive images of a

4

young male child, now identified by the government as Minor A. According to the government, Stokes admitted to Paisarn that he had taken the pictures during the previous evening, October 8, 2003. Stokes proceeded to explain that Minor A was a prostitute, that Stokes had paid Minor A for engaging in oral sex, and that Stokes had dropped Minor A off in his car just minutes prior to the execution of the search warrant. Stokes also admitted to having had sex with young male prostitutes about once per month and, specifically, having had sexual contact with Minor A on three different occasions during the previous five months.

Stokes contends that all of his admissions to Paisarn were made in response to Paisarn's direct questions. Stokes asserts that Paisarn ordered him to "stand in the corner" and "not to move" prior to asking him questions. Under these circumstances, Stokes claims, a reasonable person would not have felt free to leave or to refuse to answer Paisarn's questions.

The search continued, and Colonel Thongsuk, the senior Thai officer at the scene, asked Stokes to open a locked safe located in the bedroom. After consulting briefly with U.S. Customs Agent Gary Phillips, who had identified himself as a law enforcement officer from the American embassy, Stokes decided to comply with Thongsuk's request and unlocked the safe. From inside it, Thai officers recovered a recordable compact disc, which Stokes immediately admitted contained pornographic images of children, some of which he himself had made. According to the government, Thongsuk and Paisarn then asked Stokes some "follow-up questions," in response to which Stokes confessed that he sometimes took two boys home at the same time in order to watch them have sex with each other at his direction. The search of Stokes's home ended around 8:40 a.m., and Thai police officers prepared an inventory of the items seized during the search, which Stokes reviewed and signed.

The court has already viewed a video and heard evidence concerning the search in the context of Stokes's previous motion to suppress, see Stokes, 2009 WL 4894600, *1-4, and does not expect to revisit that evidence in any depth. As explained earlier, the circumstances of that

5

search did not appear to be coercive:

> Stokes himself opened the house's gate and unlocked its door to permit the entry of Thai officers. The [search] warrant was read to Stokes by American officials who were available to translate and explain the purpose of the search. Stokes was not manacled or restrained in any way during the search; he was completely free to observe the actions of the Thai and American officials and to communicate with them while the search took place. The video of the search taken by Thai police shows that Thai and U.S. officers were highly accommodating toward Stokes, asking his permission before handling items and allowing Stokes to retrieve items from a locked safe himself. Officers did not intimidate or act even slightly aggressively toward Stokes. As far as the video depicts, no officer even raised his voice. Stokes apparently felt so comfortable that he consulted Special Agent Phillips as to whether he should comply with the instructions and requests of Thai officers at all . . . . Stokes was not immediately arrested or otherwise detained.

*Stokes*, 2009 WL 4894600, *10. In addition to their relevance to the suppression motion, these factual determinations bear on whether Stokes was "in custody" for *Miranda* purposes. Stokes was in his own home, *see United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial."), and he was not handcuffed or physically restrained during the search. *Cf. United States v. Newton,* 369 F.3d 659, 676 (2nd Cir. 2004) ("Handcuffs are generally recognized as a hallmark of formal arrest.") (citations omitted). As shown on the video, Stokes wandered in and out of rooms throughout the search. At one point, Stokes is seen on the video holding a can of soda and conversing pleasantly with Investigator Paisarn. The video shows that there were several Thai officers present in Stokes's home during the search, but their behavior does not appear to be intimidating or coercive. These circumstances all suggest a "more casual scene" rather than a "police dominated, inherently coercive interrogation." *Axsom*, 289 F.3d at 502.

The court recognizes that, although obviously relevant, the video and prior testimony may not be conclusive on the issue of whether Stokes was in custody when he made statements. The video does not record every moment of the search, and the law enforcement officers who testified previously were not asked whether Stokes was ordered not to move or otherwise constrained to answer questions. Accordingly, the court will consider certain limited evidence on the issue of

whether Paisarn or other officers ordered or instructed Stokes in such a way that Stokes was in custody, for *Miranda* purposes, at the time of the search.

**IV.     Questioning by Thai Officers**

Following the search, Thai officers "asked [Stokes] to accompany" them to a nearby police station. Once there, the government asserts, Stokes requested that Investigator Paisarn not show Agent Phillips the images contained on the seized compact disc. (Gov't Resp., at 3-4.) Stokes allegedly told Paisarn that the images were "mai dee," a Thai phrase translated in English as "not good." (*Id.*)[1] According to the government, Colonel Thongsuk then asked Stokes a series of questions about the images. The government asserts that Paisarn acted solely as Thongsuk's translator during this questioning, but Stokes contends that it was Paisarn who directed the questions and appeared to be leading the interrogation. Stokes claims that neither Thongsuk nor Paisarn informed Stokes of his rights under *Miranda* and that Paisarn did not identify himself as an a U.S. agent. According to Stokes, "not only did Pairsan [sic] fail to advise Mr. Stokes that his statements would be used against him, he made the affirmative representation that they would NOT be used against him." The government denies that Paisarn or any other officer made any such representations, and Stokes has not yet told the court what exactly he claims Paisarn said. In response to the questions, Stokes admitted to being the adult male who is partially visible in several of the seized images having sexual contact with young boys.

The court has not previously considered any evidence regarding the circumstances of Stokes's transportation to the Thai police station or his subsequent questioning. According to the government, Stokes agreed to accompany the officers to the station, drove his own car, and was

---

[1]     The evidence thus far indicates that, with only rare exceptions such as this one, most of the communication between Stokes and the officers was conducted in English. The government asserts that Paisarn acted primarily as Thongsuk's interpreter, translating Thongsuk's questions from Thai into English for Stokes's benefit. The video depicts Stokes speaking primarily in English throughout the search, and it appears that Stokes is not completely fluent in the Thai language.

allowed to leave immediately after being questioned–factors that militate against a finding that Stokes was in custody. *See Beheler*, 463 U.S. at 1125; *Mathiason*, 429 U.S. at 495. Stokes contends, however, that he was "detained" and brought to the police station by Thai police officers who rode with him, inside his vehicle. The government concedes that Thai officers "traveled with Stokes to the station," but does not elaborate further. (Gov't Resp., at 4.) Greater development of these facts is necessary to determine whether Stokes was compelled to accompany Thai officers to the police station or whether a reasonable person in his position would have felt free to refuse.

Particularly troublesome is Stokes's allegation that Paisarn assured Stokes that his statements would not be used against him. Paisarn's alleged assurance, in direct contradiction of *Miranda*, may well implicate the voluntariness of Stokes's subsequent admissions and require the exclusion of his statements. "Trickery, deceit, even impersonation do not render a confession inadmissible . . . unless government agents make threats or promises." *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) (collecting cases). A material misrepresentation about the suspect's rights, however, "could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose." *Sprosty v. Buchler*, 79 F.3d 635, 646 (7th Cir. 1996) (citations omitted). Further development of the facts is necessary to determine whether Paisarn did indeed make the alleged statements, and, if so, whether those representations crossed the line separating permissible police interrogation from an impermissible misrepresentation or promise.

**V.      Post-*Miranda* Interrogation by Agent Phillips**

At around 9:50 a.m., after about fifteen minutes of questioning by Thongsuk and Paisarn, Agent Phillips and another U.S. customs investigator arrived at the station and began interviewing Stokes.[2] According to the government, Phillips advised Stokes of his *Miranda* rights, told Stokes

---

[2] The briefs do not indicate where Agent Phillips was during the time Thongsuk and Paisarn were questioning Stokes.

that he was not under arrest, and explained that Stokes was free to leave the station if he so chose. Specifically, Phillips told Stokes that Stokes could tell the officers "to go pound sand if [he] want[ed] to," apparently meaning that Stokes was free to refuse to cooperate with the investigation. (Gov't Resp., at 4.) The government asserts that Stokes said he understood that he was free to leave but consented to answer Phillips's questions anyway. Stokes, in contrast, contends that he was never informed that he was free to leave the station.

During the ensuing interrogation, Stokes told Phillips that he had last visited the United States in 2001 and had returned to Thailand in early 2002. Stokes also admitted that he had taken all of the sexually-explicit images that were recovered at his home. He repeated that he had paid Minor A to engage in sexual activity the previous evening and again confessed to having had regular sexual contact with Minor A on earlier occasions. Stokes also admitted to having had sexual contact with another young Thai boy, now referred to as Minor B, during the same period. According to the government, Stokes described the sexual acts he engaged in with the boys in some detail. Finally, Stokes stated that he knew his actions would not be accepted in the United States (it is not clear whether Stokes meant that he knew his actions were unlawful in the United States or merely behaviorally aberrant) and promised that he would refrain from similar acts in the future. Following the interview, Stokes was permitted to leave the police station.

Stokes seeks to exclude his post-warning statements on the theory that he was still in police custody and that Phillips's "midstream recitation of warnings" was impermissibly designed to circumvent *Miranda*. *Cf. Missouri v. Seibert*, 542 U.S. 600, 604 (2004); *United States v. Peterson*, 414 F.3d 825, 828 (2005) ("[*Seibert*] holds that post-warning statements are inadmissible if they duplicate pre-warning statements intentionally elicited in an effort to evade *Miranda* . . . . The thinking behind this is that a suspect who has been induced to make a statement may see little point in clamming up after warnings have been given; he may think that the cat is out of the bag.")

For *Seibert* to apply here, the court would have to find that law enforcement officers

intentionally withheld warnings for the purpose of evading *Miranda.* This proposition strikes the court as unlikely. The investigation of Stokes required substantial participation by Thai law enforcement officers, who, so far as the record reveals, had no specific understanding of American criminal procedure. Assuming Stokes was in custody during his initial questioning, a failure by Colonel Thongsuk or other Thai officers to administer *Miranda* warnings may have been an innocent mistake based on relative unfamiliarity with the requirements of U.S. law. If, as the government asserts, Stokes never was in custody, then obviously Thongsuk and his men made no mistake at all by not giving warnings.

If the court concludes that this interrogation was not a "deliberate end run around *Miranda,*" it will then be required to determine whether the fact that Stokes's had made pre-warning statements rendered his subsequent post-warning statements involuntary. *See Oregon v. Elstad,* 470 U.S. 298, 309-14 (1985) ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."); *United States v. Stewart*, 388 F.3d 1079, 1092 (7th Cir. 2004) ("If . . . the interrogation process at work here was not a deliberate end run around *Miranda,* then [the suspect's] first statement must be evaluated for voluntariness under *Elstad*.") As already stated, it is unclear whether Paisarn's alleged promise not use any of the pre-warning statements against Stokes rendered them involuntary. Nor is it clear whether Stokes's pre-warning admissions would have undermined the import of any subsequent *Miranda* warnings by creating the impression that the "cat [was] out of the bag."

The court remains mindful that, in most circumstances, "[a] careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will." *See Elstad* 470 U.S. at 310 (quotation omitted). The court therefore intends to consider

the evidence to determine whether Phillips's ultimate delivery of *Miranda* warnings and assumption of control over the questioning represented a sufficient break in the circumstances to permit admission of the post-warning statements regardless of any prior failure by either Paisarn or the Thai authorities. *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring) ("For example, a substantial break in time and circumstances between the pre[-]warning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn.") *See also Stewart*, 388 F.3d at 1091- 92. Based on Stokes's own allegations, it seems unlikely that Stokes thought that the "cat was out of the bag" at the point that Phillips issued the warnings. Stokes claims that Paisarn and Thongsuk had informed him that nothing he had said prior to the issuance of warnings would be used against him. Those representations arguably underscored the significance of subsequent *Miranda* warnings, in which Phillips–the only person who had identified himself as an agent of U.S. law enforcement–explicitly told Stokes that his subsequent statements would be used against him.

**CONCLUSION**

The court will hold an evidentiary hearing in response to Defendants' motion to suppress his statements [D.E. 146] to determine whether Stokes was in custody at any point and whether his statements were voluntary.

ENTER:

Dated: May 7, 2010

_____
REBECCA R. PALLMEYER
United States District Judge

.